# PETITION FOR WRIT OF HABEAS CORPUS

## UNDER 28 U.S.C. SECTION 2254

*ORIGINAL*

Prisoner's Name:  **LYNDON FITZGERALD PACE**

Prisoner's Number:  ID 291171

Place of Confinement:  Georgia Diagnostic and Classification Prison
Jackson, Georgia 30233

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 2 0 2009

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

*CAP*

|  |  |
|---|---|
| LYNDON FITZGERALD PACE, ) | |
| ) | |
| Petitioner, ) | |
| ) | CIVIL ACTION NO. |
| v. ) | **1:09-CV-0467** |
| ) | |
| HILTON HALL, Warden, ) | HABEAS CORPUS |
| Georgia Diagnostic and ) | |
| Classification Prison, ) | |
| ) | |
| Respondent. ) | |

## PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Comes now the petitioner, LYNDON FITZGERALD PACE, by and through undersigned counsel, and invokes the jurisdiction of this Court pursuant to 28 U.S.C. Section 2254.

The allegations of this petition conform to the dictates of the Model Form for Use in Applications for Habeas Corpus under 28 U.S.C. Section 2254 as prescribed by the Rules Governing Section 2254 Cases in United States District Courts. Mr. Pace seeks this Court's protection and intercession because the Georgia state courts have violated his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, resulting in his unconstitutional convictions and sentences, and have likewise refused to correct these violations. To the extent that the state courts reached the merits of claims presented, their holdings are either contrary to or an unreasonable application of clearly established Federal law as established by the Supreme Court of the United States. 28 U.S.C.§ 2254 (d)(1). To the extent that the state courts based their determinations of these claims upon factual findings, those determinations rest upon an unreasonable determination of those facts in light of the evidence presented. See 28 U.S.C. § 2254(d)(2); (Terry) Williams v. Taylor, 529 U.S. 362 (2000).

Mr. Pace respectfully requests that this Court afford him all the protections promised by federal habeas corpus statutes, the Rules Governing 28 U.S.C. Section

2254 Cases in the United States District Courts, the Criminal Justice Act, the Anti-Drug Abuse Act of 1988, and all other pertinent statutes, court rules, and case law. Mr. Pace asks this Court to grant him an evidentiary hearing so that he might present the evidence necessary to support his claims, as well as an order granting this petition for writ of habeas corpus.

## I.    PROCEDURAL HISTORY

1.    On March 5, 1996, a jury sitting in the Superior Court of Fulton County convicted Mr. Pace of malice murder (four counts), felony murder (four counts), rape (four counts) and aggravated sodomy (two counts). On March 7, 1996, Mr. Pace was sentenced to death for malice murder and life imprisonment for each of the rape and sodomy charges. All of his sentences are consecutive.

2.    The name and location of the court which entered the judgment of conviction and sentence under attack is:

> Superior Court of Fulton County
>
> Atlanta, Georgia

3.    The date of the judgment of conviction was March 5, 1996.

4.    The jury convicted Mr. Pace of malice murder (four counts), felony murder (four counts), rape (four counts) and aggravated sodomy (two counts).

5.    The jury sentenced Mr. Pace to death for malice murder and life

3

imprisonment for each of the rape and sodomy charges.  All of his sentences are consecutive.

6.     The date of judgment of Mr. Pace's sentences was March 6, 1996.

7.     At trial, Mr. Pace pled not guilty.

8.     Mr. Pace did not testify at trial.

9.     The trial on the issue of guilt or innocence and the issue of sentencing was determined by a jury.

10.    Mr. Pace appealed his convictions and sentences.  The facts of his direct appeal are as follow:

    (a)    The Supreme Court of Georgia affirmed Mr. Pace's convictions and sentence of death on December 3, 1999.  Pace v. State, 524 S.E.2d 490 (Ga. 1999).

    (b)    The Supreme Court of the United States denied Mr. Pace's timely Petition for Writ of Certiorari on October 2, 2000.  Pace v. Georgia, 531 U.S. 839 (2000), reh'g denied 531 U.S. 1030 (2000).

11.    Mr. Pace filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts County on August 20, 2001, and submitted his initial amended petition on September 9, 2003.  Mr. Pace also filed two habeas petitions challenging the

propriety of his pleas of guilty to burglaries admitted as non-statutory aggravating circumstances in his capital case; those petitions were consolidated. Following an evidentiary hearing on December 2, 2003, Judge Daniel M. Coursey, sitting by designation, entered an order denying Mr. Pace's petitions on July 30, 2007.

12.     Mr. Pace filed an application for certificate of probable cause to appeal to the Supreme Court of Georgia, which denied his application on January 12, 2009.

13.     Mr. Pace now files his first federal habeas petition in the United States District Court for the Northern District of Georgia.

14.     Mr. Pace has no other petitions, applications or motions pending with respect to these convictions and sentences. Mr. Pace's convictions and sentences of death violate his rights pursuant to the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## II.    INTRODUCTION

15.     Lyndon Fitzgerald Pace grew up in an environment poisoned by violence, instability, and poverty. Mr. Pace and his family lived hand-to-mouth in filthy apartments with no utilities and so infested by roaches that at least one visitor would tie a handkerchief over her face to protect herself from the bugs. Even in housing projects like Bankhead Courts – known as "Little Vietnam," and populated by neglected and drug-abusing children – Mr. Pace's family was conspicuously

5

desperate and impoverished. For his part, Mr. Pace's father was a womanizer and violent man who beat Mr. Pace's mother, despite Mr. Pace's best efforts to stop him. At the same time, his mother forced him to operate an illegal liquor store out of the family apartment.

16.    It would have proven a challenging setting for even the most resourceful of children, but Mr. Pace faced additional obstacles, as he has been plagued since childhood by organic brain damage, borderline intelligence, and mental illness. Mr. Pace suffered a series of head injuries as a child, the first when he fell from the window of a parked car at the age of six, and has endured nauseating headaches that have left him clumsy and overly sensitive to noise and light throughout his life. He has significantly sub-standard intellectual functioning, twice failing the third grade before dropping out in the seventh grade, and was illiterate.   Most critically, Mr. Pace suffers from schizophrenia, a condition that led to his rapid mental decline and descent into psychosis at the time of the events underlying this case.

17.    In 1996, Mr. Pace stood accused as the notorious Vine City Rapist, whose rape, sodomy, and murder of predominantly elderly African-American women had received national attention. Mr. Pace's appointed counsel, the prosecution, and the trial court each had responsibilities to ensure that his trial comported with the requirements of the Constitution. Each party failed to meet those responsibilities.

18.     Despite the seemingly overwhelming DNA evidence that the state had amassed against their client, Mr. Pace's appointed counsel clung to innocence as their theory of defense at the guilt phase.  Ignoring the powerful impact that a fully-developed account of Mr. Pace's tragic history would have had upon both phases of his trial, and evidently disregarding the strength of the state's case for conviction and death,  Mr. Pace's counsel eschewed their constitutional and professional obligation to develop evidence of his mental health and social history for presentation at the guilt phase and in mitigation.  His counsel ignored critical leads regarding Mr. Pace's mental health and tragic life history.   Counsel disregarded their own expert's assessment of Mr. Pace, which suggested that he had a troubled background, impaired intellectual functioning, organic brain damage, and a major mental illness.  Counsel also disregarded their expert's professional opinion that counsel should pursue further evaluation of their client.  They ignored information that Mr. Pace had suffered at least one serious head injury and endured debilitating headaches, dizziness, and occasional blackouts; that he was illiterate and had dropped out of school in seventh grade; that he was unable to maintain steady employment; and that he had been homeless and living in a van beside his mother's house.  They disregarded ample evidence of dysfunction in Mr. Pace's family, including his father's criminal history, Mr. Pace's school records, and a police report from when Mr. Pace's mother had him

arrested for trespassing. They elided the poverty and violence endemic to both Mr. Pace's neighborhood and his family, deciding that his family was loving and normal, while he was the outlier who had somehow gone awry.

19.     After the state obtained Mr. Pace's convictions with a guilt-innocence phase presentation that, as counsel conceded, gained strength as the trial progressed, trial counsel entered the sentencing phase with only a fraction of the mitigating evidence that would have available had counsel performed their constitutional duty. Despite their cursory investigation, however, counsel had learned of Mr. Pace's borderline intelligence and organic brain damage from their expert. This evidence could have readily resulted in a life sentence, but counsel neglected to present it. Counsel instead disregarded this evidence once again, opting instead to offer a defense of residual doubt at the sentencing phase. Simply put, no reasonable counsel would have chosen this tack in the wake of the state's presentation in the guilt-innocence phase of trial.

20.     Instead of educating Mr. Pace's jury on his true social history, Mr. Pace's counsel called a few family members and acquaintances whom they did not prepare to testify, but whom they hoped would portray Mr. Pace as a normal, loving person who had been wrongly accused of the crimes for which the same jury had just convicted him. Trial counsel could not execute even this patently ineffective strategy,

8

however, as the member of the defense team responsible for the sentencing phase abdicated her duties at its beginning, leaving her wholly unprepared co-counsel to question family members who angrily insisted on Mr. Pace's innocence and belligerently challenged the jury's verdict. Trial counsel's ineffective assistance at both phases of Mr. Pace's trial virtually assured his conviction and sentence of death.

21.    For its part, the prosecution committed extensive misconduct throughout the state court proceedings against Mr. Pace, particularly in the sentencing phase of his trial. The scope of the prosecution's misconduct is breathtaking. In its closing argument at the sentencing phase, it urged the jury not to give Mr. Pace a sentence of life imprisonment because it would provide "free room and board [and] color TV" to a homeless person "liv[ing] from pillar to post" and, in an appalling comment, would gratify him sexually because "if anal sodomy is your thing, prison isn't a bad place to be."

22.    The prosecution explicitly commented upon Mr. Pace's exercise of his right to silence, comparing Mr. Pace to the thief crucified with Jesus who did not repent and was therefore not admitted to the kingdom of Heaven, before telling the jury that Mr. Pace "*has never repented. He hadn't* [sic] *said one time I'm sorry.*" The prosecution impermissibly implored the jury to send a message to the community by sentencing Mr. Pace to death, and, while brandishing a volume of the Georgia Code,

told the jurors "if you don't return a death penalty verdict, you have snatched that section of the book about the death penalty out."

23.    The prosecution introduced a cartoon that denigrated mitigating evidence by depicting a jury acquitting a defendant "by virtue of insanity, ethnic rage, sexual abuse and you name it." The prosecution further injected extrinsic and prejudicial matters into the jury's deliberations by comparing Mr. Pace to several of the most notorious serial killers in American history, including Jeffrey Dahmer, John Wayne Gacy, and Ted Bundy, and praising Bundy's jury, which sentenced him to death, for "giving him justice." But perhaps the apotheosis of the prosecution's misconduct came with its lurid "Golden Rule" argument, in which the prosecution repeatedly asked the jurors to imagine themselves in the place of the victims as it offered a graphic, imagined narrative of the events of their deaths. This last argument drew condemnation from two judges of the Supreme Court of Georgia on Mr. Pace's direct appeal.

24.    The trial court contributed to the atmosphere of bias against Mr. Pace with a series of erroneous rulings and its consistent denial of hearings and due process for Mr. Pace's motions and objections. The trial court also engaged in exchanges with Mr. Pace's counsel and made comments throughout the proceeding that suggested a  bias against Mr. Pace and his counsel.

25.    Despite all of these errors and the seemingly overwhelming evidence against Mr. Pace, a sentence of death was not a foregone conclusion. During their penalty phase deliberations, Mr. Pace's jury asked the trial court if it were possible to sentence Mr. Pace to life imprisonment without the possibility of parole. The trial court, however, opted to reply to the jury in writing without even notifying the parties of the question or putting the matter on the record.

26.    For reasons asserted more fully herein, Mr. Pace submits that in resolving his claims the state courts rendered both factual findings unsupported by the record and legal conclusions which run afoul of well-established precedent from the Supreme Court of the United States. Mr. Pace accordingly requests that this Court grant his petition and afford him appropriate relief.

## III.   CLAIMS ENTITLING PETITIONER TO RELIEF

### CLAIM I

**MR. PACE'S COUNSEL PROVIDED INEFFECTIVE ASSISTANCE IN VIOLATION OF HIS RIGHTS PURSUANT TO THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION PER STRICKLAND V. WASHINGTON, 466 U.S. 688 (1984)**

27.    This Claim incorporates all other Claims and facts in this Petition as if specifically pleaded herein.

28.    Mr. Pace's counsel provided him with constitutionally ineffective

11

assistance at all stages of the proceedings against him in violation of his rights pursuant to the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. But for this ineffective assistance, the proceedings against Mr. Pace would have had a different outcome.

29.   The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment entitle a criminal defendant to the effective assistance of counsel at trial, motion for new trial, and on direct appeal. Gideon v. Wainwright, 372 U.S. 335 (1963); Strickland, 466 U.S. 668;  Williams (Terry) v. Taylor, 529 U.S. 362 (2000); Wiggins v. Smith, 539 U.S. 510 (2003); Rompilla v. Beard, 545 U.S. 374 (2005); Williams v. Turpin, 87 F.3d 1204, 1209-10 (11th Cir. 1996); Evitts v. Lucey, 469 U.S. 387 (1985); Alvord v. Wainwright, 725 F.2d 1282 (11th Cir. 1984). The Supreme Court of the United States has long since established the standard for evaluating claims of ineffective assistance of counsel. Strickland, supra; Wiggins, supra; Williams, supra; Head v. Thomason, 578 S.E.2d 426 (Ga. 2003). To demonstrate that counsel was ineffective, Mr. Pace must show both deficient performance by counsel and a likelihood that counsel's deficient performance affected the outcome of the trial. Strickland, 466 U.S. at 687. Mr. Pace satisfies the deficient performance prong by showing that his attorney's representation fell below "an objective standard of reasonableness." Id. at 695-96. He satisfies the second

prong if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

## A.   Failure to Investigate

### 1.   Counsel's Deficient Performance

30.   Mr. Pace's trial counsel provided inadequate assistance at all phases of his trial. Counsel knew from the time of their appointment that Mr. Pace stood accused as the notorious Vine City Rapist, whose serial rape, sodomy, and murder of predominantly elderly African-American women had received national attention. For trial, the state had amassed seemingly overwhelming DNA evidence, matching six separate probes to Mr. Pace's DNA in three cases and four in the fourth.[1] T. 4774.[2]

31.   Trial counsel clung to innocence as their theory of defense at trial, although they were unable to develop an alibi or evidence of other suspects and, as

_____

[1] The state presented evidence at trial that the probability of a coincidental six-probe match is less than one in 500 million, and one in 150 million for a four-probe match. T. 4776.

[2] References to the record are as follows: "PTH." for transcript of pre-trial hearing, with the date of the particular hearing indicated after the citation; "T." for the trial transcript; "MNT." for the transcript of the motion for new trial;"ROA" for the record on appeal; "SHT" for the transcript of the State Habeas Corpus hearing on December 2, 2003; "P-" for the Petitioner's Exhibits in state habeas; and "R-" for Respondent's Exhibits in state habeas.

they acknowledged in the state habeas proceedings, the state's case "got stronger as it went on." Deposition of Michael Mears, R-67 at 35. Despite the strength of the state's DNA evidence, trial counsel concentrated their guilt-innocence investigation on identifying other suspects. Id. at 36.

### 2. What the State Presented

32.   In the guilt-innocence phase of Mr. Pace's trial, the state presented expert testimony matching the DNA evidence recovered from each of the victims to that of Mr. Pace, as well as testimony of "matching" hair evidence. The state also presented fingerprint evidence placing Mr. Pace at the scenes of two burglaries of elderly women, which the trial court admitted as similar transaction evidence. Both victims of these "similar transactions" also testified.

33.   The state called more than twenty-five additional witnesses at the guilt-innocence phase, most of whom were police officers and family members of the victims who described finding the bodies and medical and crime lab personnel. The defense, by contrast, presented no testimony from either experts or lay witnesses.

34.   For sentencing, the state had marshaled emotional testimony from the victims' families, friends and church acquaintances that described the victims as upstanding and beloved members of their community. The state was also prepared to present Mr. Pace's guilty pleas to two additional burglaries – including one in

14

which the victim was Coretta Scott King – and the testimony of the Barrett sisters, young girls who claimed that Mr. Pace had broken into their house, terrorized them, and attempted to sexually assault one of them. Reasonable counsel would certainly have considered the state's case formidable and prepared accordingly for both phases of trial.

35.   For their part, trial counsel had information about Mr. Pace that suggested both a troubled background and compromised mental health. A "drive-by" screening by a psychologist revealed that Mr. Pace had borderline intelligence and organic brain damage  and documented evidence consistent with a major mental illness.   This diagnosis fit with other information that counsel had obtained, including: that Mr. Pace had suffered at least one serious head injury and endured debilitating headaches, dizziness, and occasional blackouts, HT. 440; that Mr. Pace was illiterate and had dropped out of school in seventh grade after repeating several grades; and that Mr. Pace was unable to maintain steady employment. Counsel also had information suggesting the emotional instability of Mr. Pace, which included acting so possessively towards a former girlfriend that she filed harassment charges against him. P-50.

36.   Despite his family's assertions to the contrary, counsel had documentary evidence of dysfunction in Mr. Pace's family, including: the record from his father's

trial for kidnaping and raping his second wife in Alabama, P-31, P-75; Mr. Pace's school records; and the police report from when Mr. Pace's mother had him arrested for trespassing. The defense team learned from Mr. Pace's neighbor that Mr. Pace was homeless and living in a van beside his mother's house, P-39, while Mr. Pace's former teacher provided background information on the poverty and violence endemic to both Mr. Pace's neighborhood and his family, Mau Mem. P-53.

37.    In spite of the implications that such information would have for both phases of trial, and ignoring the evident strength of the state's case for conviction and death, Mr. Pace's counsel eschewed developing this mental health and social history evidence for presentation at the guilt phase and in mitigation. Instead, the defense team resolved to pursue a defense of not guilty, and devoted their resources to identifying other suspects and exploring alibi evidence rather than thoroughly investigating and developing evidence regarding Mr. Pace's background and mental health.

38.    Even without further development, the mitigating mental health evidence that trial counsel obtained from their expert regarding Mr. Pace's borderline intelligence and organic brain damage could have resulted in a life sentence. Counsel instead attempted a penalty phase defense of residual doubt – a defense that no reasonable counsel would have attempted, given the strength of the case on which the

16

jury had convicted Mr. Pace – "and having [Mr. Pace's] family members testify to convince the jury that Lyndon was loved and had good character, and was therefore deserving of mercy." Mau Aff. P-6; see also Mears Aff. P-4. Counsel attempted to elicit this testimony from family members despite a lack of evidence to support claims of Mr. Pace's good character and numerous indications that these family members would insist on Mr. Pace's innocence and grow combative if challenged. Mau Aff. P-6. Counsel further ensured that this ill-conceived testimony had no chance of success by utterly failing to prepare these witnesses, see Claim I B, infra.

39.    Therefore, after emotional testimony from the victims' families and friends, the defense called the following witnesses to testify at the sentencing phase: Mr. Pace's mother, Mary; two of her friends, Ida Turner and Mary Booker; five of Mr. Pace's siblings; Mr. Pace's former girlfriend, Trena Todd; and Joe Beasley, a local church leader.

40.    Ida Turner and Mary Ann Booker each testified that they knew Mr. Pace's mother when her children were young, and knew Mr. Pace as a polite, "very quiet" young man. T. 5464. Each testified that she did not believe Mr. Pace could be guilty because he had been a nice and respectful young man, and that she did not believe in the death penalty. Ms. Booker added that Mr. Pace had spoken to her grandson since his incarceration to help him stay in school and keep out of trouble.

17

41.    The state easily turned these witnesses into its own, eliciting on cross-examination that Ms. Booker did not know Mr. Pace as a grown man, but that she believed him to be responsible, intelligent and innocent, with no mental, emotional, psychological or psychiatric problems.   The state pursued this same vein with Ms. Turner, who reiterated that she did not believe in the death penalty for anything, and that Mr. Pace did not suffer abuse, mental or psychological problems, and was "always normal."

42.    Mr. Pace's brother Gary testified regarding his own military credentials, and characterized the Paces as a close-knit and normal family before observing that he had been subject to the same "temptations" as Mr. Pace, but had turned out fine. T. 5474-76. Gary also testified that he did not believe the charges were true, despite the fact that "they" (the jurors) found Mr. Pace guilty, and opined that the state had somehow manipulated the evidence against his brother.   T. 5482.   On cross-examination, the state elicited more information from Gary about the family's supposed normality, including that his brother Gregory was an airplane mechanic and his brother Darrell a skilled laborer, while nineteen-year-old Alfred lived at home with their mother. Gary agreed with the state that all had done "better than average," and stated that it was up to an individual to make personal choices and exercise responsibility in the face of temptation.  T. 5483.  Gary also said that Mr. Pace had

18

chosen to commit other crimes, and had no answer when the state asked how Mr. Pace's semen had ended up in the four decedents, except to say that the police had gone after his brother because he lived in proximity to the crimes. T. 5485.

43.     Darrell Pace testified on direct examination that Mr. Pace, his brother, was quiet and had never been in trouble. T. 5501. He related how Mr. Pace had helped rescue him from drowning in a swimming pool accident when he was a teenager, reiterated his belief in Mr. Pace's innocence, and asked the jury to have compassion for his family. T. 5504. When the state's cross-examination focused on Mr. Pace's status as a loner, his dropping out of school, and his criminal background, Darrell responded with increasing belligerence, maintaining that Mr. Pace was not a "loner," that he had no idea why he had dropped out of school, and that Mr. Pace had never been in trouble except for using drugs and once breaking into a building. T. 5506-7. Darrell was unable to tell the jury where Mr. Pace had worked or lived over the preceding ten years. T. 5507-08. He vigorously maintained that Mr. Pace was not guilty, telling the state that "I was listening to some of your evidence, and I still don't believe it." T. 5509.

44.     Jennifer Pace offered rambling testimony that Mr. Pace – her older brother by a year, so close that everybody had thought they were twins – had looked after her, and that she had spoken to him about his drug problems, which she

attributed to "friends that are not your friends . . . get[ting] you on that, and you get turned out. Then they are not – you see what type of friends you have." T. 5514. She offered her "condolences for what happened to those ladies {the decedents]" but told the jury that she wanted mercy because the death penalty would leave "a deep scar" on her family and that killing him would not change what had happened. T. 5516-7. Jennifer then told the jury that "what we need to do is make sure that we can change things so it won't happen again . . . .[Y]ou need to do things through education, you know, bringing a higher consciousness and stuff like that." She then challenged the jury "do what you have to do, but I love my brother, and I would never turn my back on him." T. 5517.

45.     Under cross-examination, however, Jennifer could not recall the number of times or dates when Mr. Pace was in prison because "that happen[ed] all the time." When asked what she would change so that nothing like this would happen again, she replied "I am saying, if a person is given a chance, and an opportunity is there for them, then things, things, they can turn their life around. *Nobody is perfect. Everbody make [sic] mistakes. Everybody go [sic] through their ups and downs.*" T. 5522 (emphasis added). When asked if she were saying that four murders was a mistake, she replied "I really don't think that I know for as far as a mistake, but I don't think – I don't think my brother did it . . . . I feel in my heart and soul that he didn't." T.

5522-3. When asked if she knew how Mr. Pace's "sperm got in the four victims," she responded "I sure don't. I know – only thing I know is what I feel. I don't know about what nobody else feel. Only thing I tell you is what I feel, and I know because I feel like if it was that way, then I would feel that, and I don't feel it." T. 5523. She concluded on a challenging tone, saying that she would impose life without parole – a sentence unavailable to Mr. Pace – because "I have mercy in my heart. I have compassion in my heart. That's what I would do. I don't know about nobody else, but that's me." T. 5524.

46.     Gregory Pace began his testimony by noting that Mr. Pace is a proud person who, "if he does anything wrong, he will admit to it," and stated that the fact that Mr. Pace did not admit committing the charged crimes proved his innocence, before casting aspersions on the jury's verdict, stating "They have convicted him. I have to live with that." T. 5528. Gregory then cautioned the jurors to think about what they would want their own verdict to be "if you the one did it, or if you the one that got convicted and you know you didn't do it, if you did it – and as far as my brother, how he is – I know if he was the one who did it, he would admit to doing it." T. 5530. He then testified that Mr. Pace had lived with him for a time "before he got locked up this time," and that he had made sure that Mr. Pace had all that he needed so that he "could not go towards the bad side." T. 5530. He closed by asking the jury

21

"not to kill him or murder him. Whatever – however anybody wants to say it." T. 5531. This testimony, again, was elicited was on direct examination. Under cross-examination, Gregory added that he did not believe in the death penalty, did not know how long he and Mr. Pace had lived together or whether Mr. Pace was abusing drugs at the time, and did not know where Mr. Pace had moved when he left. T. 5531-4.

47.     The defense also called Mr. Pace's sister Gwendolyn, or "Patty", who identified pictures of Mr. Pace and family members in childhood and asked the jury to spare his life. T. 5561. Mr. Pace's sister-in-law Penny Pace related that she had an uncle who had been shot, that the taking of a life would change nothing, and that Mr. Pace deserved to live and spend his time in jail thinking about "the goodness of God." T. 5564. Under cross-examination, however, Penny conceded that Mr. Pace had never admitted to the crimes, and agreed that the murderer of the decedents in this case had shown no mercy.

48.     Finally, Mr. Pace's mother, Mary, asked the jury "to give him life so at least I can talk to him sometimes." T. 5566. This was the sum of the family testimony offered for the purported purpose of showing that Mr. Pace had "good character" and was "deserving of mercy."

49.     Only Trena Todd, Mr. Pace's former girlfriend, offered even arguably mitigating evidence, testifying that while Mr. Pace was extraordinarily quiet, she

recognized that he "had a lot of good" in him because she spent more time with him than his family. T. 5539. She further testified that he could not read well enough to fill out a job application but was not disrespectful or violent, and asked for mercy. On cross examination, she affirmed that Mr. Pace had lived on his own in only one place and had moved back in with family members after three or four months. T. 5548. She stated that Mr. Pace was not emotionally deprived, and was quiet, rather than aloof. T. 5549.

50.     The defense also presented the testimony of Joe Beasley, a minister of the Antioch Baptist Church in Vine City. Mr. Beasley did not know Mr. Pace, but told the jury that members of the Vine City community knew how the death penalty was used in the community, and that most opposed to it. On cross examination, he stated he did not believe in the death penalty. T. 5554.

51.     As reasonable counsel would have foreseen, the defense's penalty phase presentation played into the hands of the prosecutor, who in closing argument ridiculed the defense's feeble good character evidence by noting Mr. Pace's criminal activity "from 1981 to 1992." T. 5588.[3] The prosecutor then cited the defense's own witnesses to foreclose any possibility of mitigation, claiming incorrectly but without

---

[3]Mr. Pace contends that the prosecution committed extensive misconduct in its closing argument, as detailed in Claim II, infra.

refutation that Mr. Pace's upbringing was normal and that the remainder of Mr. Pace's family were upstanding citizens. T. 5589. He also attributed Mr. Pace's unchanged demeanor throughout the trial to remorselessness. T. 5604.

### 3. What Reasonable Counsel Could Have Presented

#### a. Mr. Pace's Background of Poverty, Violence and Instability, along with Serious Head Injuries suffered as a Child, Precipitated Increasing Mental Health Problems

52. Contrary to what the jury heard from both the prosecution and defense at trial, Mr. Pace was not a normal child from a poor but loving home. Mr. Pace grew up plagued by organic brain damage, borderline intelligence, and mental illness in an environment poisoned by violence and poverty. A reasonable investigation would have uncovered a wealth of mitigating evidence with implications for both phases of his trial.

53. Counsel's failures were many. They unreasonably neglected to speak with numerous individuals who had critical evidence relevant to mitigation and criminal responsibility. For example, even though counsel knew of Mr. Pace's uncle James Smith and gathered what they incorrectly believed to be Mr. Smith's criminal record, P-69[4], they neither sought his medical records nor spoke with his daughter,

---

[4]Trial counsel gathered criminal records for the wrong James Smith. The Mr. Smith who is Mr. Pace's uncle does not have a criminal record. P-69.

Jennifer Banks. Leonard Aff. P-5, Mau Aff. P-6. Had counsel taken either step, they would have learned of Mr. Smith's schizophrenia, which "certainly would have alerted" the defense to Mr. Pace's possible genetic link to schizophrenia. P-5.

54.     Counsel also failed to speak with any members of the McDaniel family, who served as surrogate parents for Mr. Pace's mother, raised his sister, and provided food and shelter to his family throughout his childhood. Sandra McDaniel, Mr. Pace's cousin, could have attested to the true circumstances of his unstable upbringing and his manifestation of odd and disturbing behavior as early as 1987, well before the crimes in this case. McDaniel Aff. P-19

55.     Counsel neglected to speak with any of the inmates incarcerated pre-trial with Mr. Pace at the Fulton County Jail or anyone who knew him during his stay in the Lakewood boardinghouse. Had they spoken with these individuals, they would have learned that Mr. Pace exhibited paranoia and other classic traits of major mental illness. See P-5, P-10, P-12, P-13, P-14, P-17, P-19.

56.     Counsel ignored information they did have documenting Mr. Pace's chronic occupational and social dysfunction, also indicative of mental illness. P-67[5], P-68[6], P-9, P-18, P-50 at 433.

---

[5]Mr. Pace's employment records.

[6]Mr. Pace's probation records. See, inter alia, pp 581-82, 629, 633-35.

57.  Indeed, some of the mitigating evidence available to counsel had they conducted a reasonable investigation includes the following:

(a)  Mr. Pace's father, Douglas Pace, was a chronic womanizer, poor provider and violent man who regularly beat Mr. Pace's mother. Mr. Pace's sister, Jennifer Pace, could have testified how even as a child Mr. Pace would attempt to stop their father from abusing their mother. J. Pace Aff. P-24. Mr. Pace's mother could have added that when they fought Douglas would threaten to "take me into the woods and blow me away" – a prospect that so frightened Jennifer that she would suffer nosebleeds so that she could stay home from school and make sure that her father did not kill her mother. M. Pace Aff. P-30.

(b)  Sandra McDaniel could have testified that Mr. Pace's family lived hand-to-mouth in filthy, roach-infested apartments with no utilities, and relied upon Annie Mae McDaniel for food and money. S. McDaniel Aff. P-19. Sandra McDaniel could have described tying a handkerchief over her face when spending the night at the Paces' house "so that the roaches wouldn't crawl into my mouth while I was sleeping." Id.

(c)  The family lived for quite some time in a housing project called Bankhead Courts. Doris Grissom, a teacher familiar with the project, remembered that it was known as "Little Vietnam" and described how "[y]ounger children roamed around the apartment complex at all hours of the day, unattended, and older children sniffed glue and smoked pot in plain view." Grissom Aff. P-11. She also knew Mr. Pace's family "[as] one in which the children often did not have clean clothes, and they frequently did not have enough to eat." Id.

(d)  Mr. Pace twice failed the third grade and dropped out of school in seventh grade. His family so neglected him that no one save his older brother Darrell knew that he was completely illiterate. D. Pace Aff. P-25.

26

(e)     Mr. Pace began sniffing paint at the age of ten, P-25, and using other drugs to self-medicate his headaches and hopelessness, Dudley Aff. P-1. Mr. Pace's family noticed his drug use but did little to counter it. P-25, P-27.

(f)     Mr. Pace's mother made him and Darrell run a "liquor house" out of their Bankhead Courts apartment, re-selling liquor and beer that she purchased to people in the neighborhood. P-25.

(g)     Mr. Pace attempted to leave Atlanta on several occasions, but was thwarted. He moved to Birmingham to live with his father when he was approximately thirteen years old, but returned to Atlanta when his sister, Jennifer Pace, became pregnant by a man in his thirties when she was only twelve years old. J. Pace Aff. P-24. Mr. Pace's attempt to live with his older brother Gary was thwarted just weeks later when Gary's military service took him overseas.

(h)     Within two years of returning to Atlanta from Birmingham, Mr. Pace was charged with possession of marijuana and burglary. After another arrest for burglary and marijuana, Mr. Pace broke into a school and stole cheese and salad dressing, explaining to police after his arrest that he was hungry. P-41. With no steady place to stay, he drifted from one family member to another and was arrested several more times. In 1986, he was arrested on another drug charge and put on probation.

58.     Had trial counsel conducted a reasonable investigation, they also could have obtained mitigation revealing Mr. Pace's mental illness and organic brain damage. When Mr. Pace was approximately six years old, he fell through the window of a parked car and landed on his head. He received no medical attention until a week later, when his mother concluded that he "still didn't seem right" and took him to the

hospital, where doctors discovered that he was bleeding internally. P-30. Mr. Pace's head was ultimately lanced, drained and packed with gauze. Id. He subsequently suffered a series of head injuries and endured nauseating headaches throughout his childhood. P-1, P-30, P-33, P-28, P-25. He was notably clumsy, "always falling down" and hitting his head, and often complained of headaches. P-33, P-34. He began leaving school to hide in the heating ducts of his house, in part because "loud noises and bright lights [at school] . . . bothered his headaches." P-33.

59.    Counsel would have learned of Mr. Pace's potential genetic links to mental illness, including that his maternal grandmother suffered from "spells," and her son James – Mr. Pace's uncle – had a history of mental illness, including a diagnosis of schizophrenia.

60.    Counsel also would have learned about the dramatic deterioration of Mr. Pace's mental health well before the crimes at issue in this case. As Sandra McDaniel remembered Mr. Pace's visits to her ailing mother, Annie Mae McDaniel, in 1987:

> I don't know what was going on with Lyn then, but something wasn't right. He didn't talk to us, but mostly just sat around looking distracted. He seemed upset or angry a lot of the time, but he didn't yell or argue; he just looked disturbed. And he would space out. While he was supposed to be watching tv, he'd just look off at nothing and seem like he wasn't even in his body. Whenever I saw him do that I would tell my mother that he was "tripping again" – she'd seen him do it, and knew what I meant – and she'd tell me to snap my fingers near his head, to try to snap him out of it. I didn't mean tripping like drugs because it wasn't

28

drugs; it was like he just wasn't there behind his eyes. He didn't get angry or agitated when it happened, so he wasn't scary. *He seemed a little bit like James* [Mr. Pace's schizophrenic uncle]. Even when he wasn't spacing out he was strange. He didn't allow anyone to keep the back or front doors open at our house, ever, because he kept saying that someone was after him.

S. McDaniel Aff. P-19 (emphasis added).

61.     On October 28, 1987, the day that Annie Mae died, a devastated Mr. Pace saw his probation revoked and missed her funeral. P-19. After Mr. Pace returned from an incarceration of approximately four months, Jennifer observed a dramatic change in his personality, noting that her brother, who had always been quiet and calm, "didn't seem to be able to deal with me. All of a sudden, he would get agitated by things I said, and he'd get upset . . . He just couldn't seem to control his reactions." J. Pace Aff. P-24. She considered that he might have begun abusing drugs again, but believed "he was different in a more permanent way, like a personality change . . . ." Id. She found him preoccupied with being "strong and not weak," and obsessing over past moments of supposed weakness.

[He believed that] even though he did everything he could to take care of everyone and make things right in the world, there was always someone or something trying to bring him down . . . . It was clear how bad he felt; he even once mentioned suicide to me. That was the first time I realized how much he might be keeping from me.

Id.

62.     Mr. Pace's family lost track of his whereabouts from June 1988 through

29

May 1989 – a period that encompassed the crimes in this case. When Mr. Pace resurfaced in the summer of 1989, he found only intermittent employment, and by the following year exhibited active hallmark traits of mental illness, including hallucinations and talking to himself. P-9, P-10, P-12, P-17, P-18. In 1991, he was arrested for burglarizing the homes of Coretta Scott King and another woman and served four months in prison. Following his release, he was essentially homeless, drifting between a boardinghouse and a van parked outside his mother's home. P-9, P-10, P-18. Mr. Pace's boardinghouse roommate, Jerry Johnson, could have testified to his poor hygiene and his talking to himself. P-10. Mr. Pace was living hand-to-mouth when arrested in 1992 and charged with the crimes at issue in this case. P-68.

**b.** **Mr. Pace is schizophrenic and borderline retarded, and was actively psychotic at the time of the crimes.**

63.     While the trial court approved funds for a mental health expert in the fall of 1993, Mr. Pace's counsel did not have Mr. Pace evaluated until September of 1995, when the defense asked psychologist Dennis Herendeen to perform a "drive-by" screening of Mr. Pace for two specific issues: mental retardation and brain damage. P-48 at 416, P-3, P-5, P-6.[7]

---

[7]The defense provided Dr. Herenden with nothing more than notes from her meetings with Mr. Pace's mother, father, sister and a teacher; an interview with Mr. Pace; and an incomplete timeline of events in Mr. Pace's life. P-3, P-48.

64.     After conducting this screening, Dr. Herendeen informed the defense that Mr. Pace's test results indicated an IQ of approximately 78, organic brain damage and possibly bipolar disorder – a major mental illness.  P-44, p. 385, P-5, p. 191, P-3. Most significantly, Dr. Herendeen told defense counsel that the test results – which featured elevated scales for paranoia, mania, and schizophrenia – "indicated further evaluation should be pursued."  Herendeen Aff. P-3 at 181.  The defense told Dr. Herendeen that they "would let [him] know," but Dr. Herendeen "was not asked to do anything further on Mr. Pace's case."  Id.  Indeed, despite reporting at the final pretrial hearing on November 22, 1995, that they *would* present a mental health expert at trial, trial counsel ultimately informed the state on December 4, 1995, that no mental health expert would testify.[8]  Trial counsel made no further effort to follow up and develop this evidence.

65.     The importance of this neglected evidence emerged in post-conviction proceedings, when Mr. Pace finally received the recommended follow-up testing by a forensic psychiatrist, Dr. Richard Dudley, and a neuro-psychologist, Dr. Paul Nestor.  Both experts concurred that Mr. Pace indeed suffers from schizophrenia.  As summarized by Dr. Nestor, their "findings provide strong and unequivocal evidence of a longstanding, substantial disorder of thought and perception that has grossly

---

[8]  Mr. Pace's trial began January 22, 1996.

31

impaired Lyndon's ability to recognize reality, exercise sound judgment, and to meet the everyday demands of life." P-2. Dr. Nestor's tests, moreover, showed that Mr. Pace is borderline mentally retarded, noting that 91 percent of persons his age have a higher IQ than he.

66.    Dr. Dudley also underscored that Mr. Pace showed "clear evidence of symptoms of schizophrenia at the time of the offenses for which he is now sentenced to death," including command auditory hallucinations leading him to believe "that unforeseen forces and powers may at times control his thinking and his mind." P-1 at 35. Dr. Dudley concluded that *"at the time of the crimes, Lyndon was suffering from an acutely psychotic phase of schizophrenia, compromising his perceptions, judgments and behaviors, such so that his actions were not the volitional actions of a person who does not suffer from schizophrenia."* P-1 (emphasis added).

67.    Dr. Dudley further determined that prior to his trial, Mr. Pace had related many of these same symptoms of schizophrenia that Dr. Dudley had observed – including "delusions, hallucinations, hostility, social withdrawal, outbursts of anger and formal thought disorder as evidenced by poverty of speech content" – in a series of somatic complaints to Dr. Herendeen. P-1[9]. Dr. Herendeen subsequently agreed

---

[9]Mr. Pace reported changes in his sense of smell and taste; blurred, double, or lost vision; seeing flashing lights; strange sounds in his ears; black-out spells; periods of "lost" time unrelated to any alcohol or drug use when without warning "everything

that he would have reached the same conclusions as Drs. Dudley and Nestor had

counsel asked him to conduct a follow-up investigation. P-3.[10] As Dr. Dudley noted,

however, "[t]here is no indication any of this information was further developed." P-

1.

68.    Mr. Pace's reduced ability to control his actions has direct relevance in

both phases of the trial for issues of culpability, intent, and mitigation, and speaks to

his lack of intent and lack of depravity of mind.  It was vital for his jurors to hear this

information.  His counsel's ineffectiveness ensured they did not.

**c.    <u>The state habeas court erred in its consideration of this
evidence.</u>**

69.    The state habeas court erroneously determined that "[m]uch of the

testimony contained in the affidavits from family and friends is cumulative of

---

stops except my eyesight"; trouble remembering words and understanding speech;
and problems with keeping his temper and with losing interest.

[10]Indeed, as noted above, the personality assessment administered by Dr.
Herendeen had documented Mr. Pace's "significantly elevated" paranoia and
"elements of grandiosity and inflated self-esteem", while "his pattern of scores on a
scale for Schizophrenia 'indicates that he experiences unusual perceptual or sensory
events and/or harbors unusual ideas that may involve delusional beliefs.'" Mr. Pace's
screening results indicated that he considered the following propositions as "mainly
true": his thoughts are broadcast so others can hear them, he has heard voices that no
one else can hear, and others can read his thoughts. Mr. Pace also judged as "very
true" the statement "I'm the target of a conspiracy."

testimony presented at trial, and all the information contained in the affidavits was known to counsel." Order at 28. That determination was inaccurate and unreasonable. As detailed above, trial counsel's failure to speak with numerous available witnesses kept them from learning of Mr. Pace's genetic predisposition to mental illness and his deteriorating mental health at the time of the crimes.

70.    The state habeas court also erroneously and unreasonably concluded that these affidavits contained information "damaging" to Mr. Pace's contentions and approving "the judiciousness of counsel's choice to avoid such risks." Order at 28-29. The example used by the court illustrates the error in its reasoning. The court asserts that the defense was correct to eschew powerful testimony regarding Mr. Pace's deteriorating mental state from Mr. Pace's roommate, Jerry Johnson, because Mr. Johnson would have revealed that Mr. Pace was unfaithful to his girlfriend, vandalized his house and car, physically fought him, allegedly abused crack cocaine, and committed robberies. This ignores the fact that defense counsel, due to their inadequate investigation, did not even know that Mr. Johnson existed. How, then, could they make the strategic decision not to present this evidence? A decision based upon ignorance is neither reasonable nor strategic. Moreover, even if defense counsel had made such a decision, it would have been unreasonable in light of the gravity of the crimes of which Mr. Pace stood accused and the import of the mental health

34

evidence Mr. Johnson could offer.  The Supreme Court has held that even where "not all of the additional evidence [is] favorable," the double-edged nature of the evidence does not excuse counsel's deficient performance.  (Terry) Williams, 529 U.S. at 396; see also Rompilla v. Beard, 545 U.S. 374 (2005).

71.    The state habeas court adopted wholesale several false constructions that the state placed upon this evidence in its post-hearing briefing in a belated attempt to undermine its significance.  The state habeas court adopted these constructions despite the fact that the state offered neither testimony nor evidence in the state habeas proceedings to refute the conclusions by Drs. Dudley and Nestor that Mr. Pace suffers from schizophrenia, brain damage, and borderline retarded intellectual functioning.[11]  These erroneous conclusions should not be credited by this Court.

72.    The lower court relied on Dr. Herendeen's testimony in another case to justify its belief that a claim based upon Mr. Pace's mental retardation was not "promising."  Order at 23, n. 101.  As the doctor's testimony in another case is irrelevant, the court erred in considering it.  Even so, Mr. Pace's IQ of 78 constitutes borderline mental retardation, and counsel could have "put on proof that his low IQ brought him close to the line of retardation and that his family background and

_____

[11]The state habeas court's errors include stating that trial counsel "had Pace evaluated by psychologist Martin Shapiro."  Order at 22.  Martin Shapiro is *not* a psychologist; he is a statistician whom the defense consulted regarding DNA.

educational and social history showed extreme deprivation that affected his moral culpability." Dickerson v. Bagley, 453 F.3d 690, 697 (6th Cir. 2006).

73.    The state habeas court erroneously adopted a contention made by the state for the first time in its post-hearing brief that the affidavits by Drs. Dudley and Nestor were not credible because they did not "acknowledge the difficulty of conducting a retrospective evaluation." Order at 27; State's Post-Hr'g Brief at 53. Both the state habeas court and the state rely solely upon a Fifth Circuit case that allegedly faults defense experts, including Dr. Dudley, for this same supposed failure, despite the fact that this sort of mental health evaluation is routinely performed in both criminal and civil cases. State Habeas Order at 27, citing Dunn v. Johnson, 162 F.3d 302 (5th Cir. 1998). Setting aside the scientific and legal irrelevance of such an observation, this Court should note that the state made no effort to question Dr. Dudley, through either deposition or cross-examination, about this supposedly decisive failure.

74.    The state habeas court also erred in concluding that the findings of Drs. Dudley and Nestor conflicted with those of "mental health experts" at the Georgia Diagnostic and Classification Prison at Jackson.[12]  Order at 27.  The state habeas

---

[12]The habeas court's reference to Mr. Pace's prior records was improper.  Any note or remark by prison staff subsequent to Mr. Pace's trial has no bearing on whether he received the effective assistance of counsel to which he is constitutionally

court bases this conclusion on two incorrect suppositions advanced by the state: that "prison psychologists" administered a health screen upon Mr. Pace's admission that determined he needed no mental health treatment; and that while prison psychologists diagnosed Mr. Pace with delusional disorder in March 2001, they determined he needed no further mental health services after three months had passed. Order at 28. Both conclusions are simply false. In the first place, the "mental health screen" upon admission to the prison on which the state habeas court relies is merely a "screening" questionnaire administered by a *counselor*, not a psychologist. See R-62 at 5964-67. Moreover, Dr. Beecham, the prison *psychiatrist* who diagnosed Mr. Pace with delusional disorder in March 2001 after Mr. Pace sent bizarre letters to the warden and his trial judge, did *not* determine that Mr. Pace no longer needed treatment. On the contrary, Dr. Beecham noted that Mr. Pace's mental health problem was "unchanged" but that he refused treatment, R 62 at 5946, and, after indicating some question as to whether Mr. Pace suffered from "Psychosis," observed that he probably had "ongoing delusional thought," if not acute hallucinations. P 72 at 961, R 62 at 5970.

     75.    Moreover, there is no evidence that Dr. Dudley's findings "conflict" in

---

entitled and, more specifically, whether his attorney conducted a thorough, independent investigation into possible areas of mitigation.

any way with those of Dr. Beecham. It is critical to note that because the state offered no testimony by any of these alleged "mental health experts" who supposedly disagreed with Dr. Dudley's conclusion, Dr. Beecham has never been asked about Dr. Dudley's diagnosis. By contrast, Drs. Dudley and Nestor each accounted for Dr. Beecham's diagnosis in reaching their conclusions. Dr. Dudley concluded that schizophrenia was "a more accurate diagnosis" than delusional disorder because, *inter alia*, Mr. Pace "clearly shows evidence of neuropsychological impairment, which almost invariably accompanies schizophrenia, but not delusional disorders." P-1 at 136. Dr. Beecham made his diagnosis without knowledge of this neuropsychological impairment; he also neither reviewed the background materials on which Dr. Dudley relied in reaching his diagnosis nor interviewed members of Mr. Pace's family. For his part, Dr. Nestor testified that he understood how Dr. Beecham had reached that conclusion because Mr. Pace does have delusional beliefs. R. 68 at 6533, 6536-37.

76. The state habeas court cited deposition testimony from Dr. Nestor to the effect that he did not personally test whether Mr. Pace was mentally ill at the time of the crimes at issue in this case. State Habeas Order at 26. However, as Dr. Nestor testified, he was not asked to establish that fact, as that determination fell within the ambit of Dr. Dudley's evaluations. As discussed above, Dr. Dudley indeed

38

determined that Mr. Pace suffered from schizophrenia at the time of the crime – a finding, again, that is uncontradicted.[13]   The state habeas court's conclusions regarding Drs. Nestor and Dudley were unreasonable in light of the full facts.

77.    The Supreme Court of Georgia subsequently elided these errors in denying Mr. Pace's application for a certificate of probable cause to appeal, writing that "while the habeas court erred in some instances in considering the effect of counsel's alleged sentencing phase deficiencies on the jury's finding of guilt rather than its selection of a sentence in determining whether the Petitioner has shown the necessary prejudice to constitute ineffective assistance at the sentencing phase of trial, (see Head v. Carr, 273 Ga. 613, 626 (C) (3) (2001)), the habeas court did not err in finding that the Petitioner has failed to show that counsel's sentencing phase performance in those instances was deficient under constitutional standards and there is no arguable merit to the Petitioner's ineffective assistance of counsel claims."

### 4.    Counsel's Failure to Conduct a Reasonable Investigation Was Objectively Unreasonable and Prejudiced the Outcome of Mr. Pace's Trial

78.    Although counsel is afforded deference in selecting a trial strategy, its

---

[13]Dr. Nestor concluded that all of the information from Mr. Pace's social history, neuropsychological testing and neuropsychological and psychiatric assessment provided "strong and unequivocal evidence of a longstanding and substantial" disorder consistent with schizophrenia.  P-2; R at 163.

decision "must be reasonably supported and within the wide range of professionally competent assistance." Turpin v. Christenson, 497 S.E.2d 216 (1998). This Court has stated emphatically that before selecting a strategy, "counsel must conduct a reasonable investigation into the defendant's background for mitigation evidence to use at sentencing," Christenson, 497 S.E.2d at 225, citing Jefferson v. Zant, 263 Ga. 316, 319-20, 431 S.E.2d 110 (Ga. 1993); see also Turpin v. Lipham, 510 S.E.2d 32, 40 (1998)(same). Counsel must also investigate "evidence to rebut any aggravating evidence that may be introduced by the prosecutor." Wiggins, 539 U.S. at 524, citing ABA Guideline 114.1(c) p. 93 (1989); see also Rompilla, supra (same; even when defendant and family members suggest no mitigating evidence is available, counsel is bound to make reasonable efforts to obtain and review evidence of aggravation). In Mr. Pace's case, trial counsel's failure to conduct a reasonable investigation ensured their failure in presenting mitigation and rebutting aggravation.

79.    Recent Supreme Court decisions plainly demonstrate that the unique nature of capital sentencing imposes a heightened duty to investigate upon trial counsel. Williams, supra; Wiggins, supra; Rompilla, supra. The Supreme Court has held that "[i]n assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, *but also whether the known evidence would lead a reasonable attorney to investigate further*."

Wiggins, 539 U.S. at 527 (emphasis added). As in Wiggins, trial counsel in this case "chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." Id. at 527-8. See also Turpin v. Lipham, 270 Ga. 208, 510 S.E.2d 32, 36 (1998) (after psychiatrist determined competency and sanity, counsel's failure to have expert review institutional mental health records for mitigation "was not reasonable under the circumstances confronting them before and during the trial.")

80.    As this Court noted in Christenson, this "was not a situation where trial counsel was unaware" entirely of the mitigation they should have presented. 497 S.E. 2d at 225. Trial counsel's failure to perform more than "a cursory investigation of their client's psychological health was not reasonable under the circumstances," Id. at 228, and their "decision to end their [mental health] investigation when they did was neither consistent with the professional standards that prevailed in [1996] nor reasonable in light of the evidence counsel uncovered." Wiggins, 539 U.S. at 534. Indeed, while "[b]egging for mercy is not incompetence per se . . . where counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance." Hendricks v. Calderon, 70 F.3d 1032 (9th Cir. 1995). In this situation, "a reasonably effective

attorney who had undertaken an appropriately diligent investigation would likely have opted for a mental defense strategy." Jennings v. Wooodford, 290 F.3d 1006, 1014 (9th Cir. 2002) (ineffective counsel "settled" on defense without reasonably investigating psychiatric factors).

81.    Counsel's failure to investigate prejudiced Mr. Pace at the guilt phase of his trial in a number of ways.  Had Mr. Pace's jury heard that at the time of the offenses he was in the throes of acute psychosis, with diminished ability to control his actions and likely believing that some other force directed his actions, it would have had the facts to support a verdict of not guilty by reason of insanity, O.C.G.A. §§ 16-3-2, -3,  or "guilty but mentally ill."  O.C.G.A. § 17-7-131(a)(2).[14]  See Jennings, 290 F.3d at 1006, 1019 (counsel ineffective for failure to investigate mental health issues raising reasonable doubt as to ability to form requisite intent).

82.    Counsel's failure to present the mental health evidence from Dr. Herendeen at the pre-trial hearing on the suppression of Mr. Pace's hair and blood samples which yielded the DNA evidence in this case prejudiced Mr. Pace, as his borderline intelligence and organic brain damage affected his ability to knowingly,

--------

[14]Under O.C.G.A. § 17-7-131, the term "mentally ill" means "having a disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." O.C.G.A. § 17-7-131(a)(2).

intelligently, and voluntarily consent to provide those samples. See Claim X, infra.

83.    Prejudice is also manifest at sentencing.  The primary purpose of the penalty phase of a capital trial is to insure that the sentence is reliable by focusing upon the particularized characteristics of the defendant. Woodson v. North Carolina, 428 U.S. 280, 305 (1976).  The jury should have "as much information before it as possible when it makes a sentencing decision," in order to "give a reasoned moral response to the defendant's background, character and crime." Barnes v. State, 496 S.E.2d 674, 688 (Ga. 1998) citing Gregg v. Georgia, 428 U.S. 153, 204, Penry v. Lynaugh, 492 U.S. 302, 327 (1989).

84.    The Supreme Court has repeatedly held that counsel's duty under Strickland must be measured by reference to the unique requirements of capital sentencing, and therefore must encompass a thorough investigation of the defendant's life history.  Williams, 529 U.S. at 398-99; see also Strickland, 466 U.S. at 691 (counsel has "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary").  The Court has found prejudice in counsel's failure to compile such as a history, as "the graphic description of [Petitioner's] childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." Id. at 398; see also Wiggins, 539 U.S. at 534 (capital counsel has

43

affirmative duty to conduct reasonable investigation of client's background).

85.     Counsel's failure to investigate also left them unable to mount a rebuttal as the state forced witnesses to characterize Mr. Pace incorrectly as a normal person from a functional home whose crimes could be explained only by pure evil – a failing noted by the Supreme Court of Georgia in Christenson. 497 S.E.2d at 226 (witnesses "forced to admit that, based on their direct testimony of Christenson's happy childhood and supportive family, Christenson had been given many opportunities in life but had decided to squander them")

86.     Similarly, counsel's failure to investigate Mr. Pace's mental health resulted in the imposition of a death sentence by a jury unaware of Mr. Pace's most relevant characteristics – his severe mental illness and profoundly compromised intellect. The mitigating impact of this mental health testimony, had it only been presented, cannot be underestimated. These facts would have fundamentally altered the jury's view of the case in Mr. Pace's favor. Middleton v. Dugger, 849 F.2d 491, 495 (11th Cir. 1989) ("This kind of psychiatric evidence, it has been held, has the potential to totally change the evidentiary picture . . .").

87.     Counsel also prejudiced Mr. Pace at the penalty phase by not presenting the evidence of his borderline intellectual functioning and organic brain damage obtained from Dr. Herendeen, especially as both the Supreme Court of the United

States and the Eleventh Circuit have found the failure to present exactly this sort of mental health testimony is constitutionally ineffective. Williams, 529 U.S. at 370 (counsel ineffective for failure to present evidence including fact defendant "was 'borderline mentally retarded,' had suffered repeated head injuries, and might have mental impairments organic in origin."); Middleton, 849 F.2d at 495 (low IQ constitutes mitigating evidence); Jackson v. Herring, 42 F. 3d 1350, 1367 (11th Cir. 1995) (same). "[N]o rational trial strategy [] would justify the failure of [Petitioner's] counsel to investigate and present evidence of his brain impairment, and to instead rely exclusively on the hope that the jury would spare his life due to any 'residual doubt' about his guilt." Frazier v. Huffman, 343 F.3d 780, 794 (6th Cir. 2003). "[C]ompetent counsel [] would have realized that their client had everything to gain and nothing to lose by introducing evidence of his brain injury at the penalty phase of the case." Id. at 796; see also Cunningham v. Zant, 928 F.2d 1006 (11th Cir. 1991)(counsel ineffective for failure to subpoena or present known medical evidence of client's mild mental retardation). Nor would the presentation of this evidence been in any way inconsistent with the family's appeal for mercy. Wiggins, 539 U.S. at 535.

88.     The prejudice resulting from the defense's failure to present mental health evidence is further underscored by the state's use of the omission, referencing

the absence of mental health evidence and extracting from each unprepared defense witness an opinion that Mr. Pace had suffered from no emotional or psychological defect nor abuse of any kind. See Silva v. Woodford, 279 F.3d 825, 847 (9th Cir. 2002) (failure to investigate evidence relating to childhood, mental illnesses, organic brain disorders, and substance abuse "profoundly prejudicial" where prosecution emphasized lack of mitigating evidence during the penalty phase).

89.     Similarly, trial counsel's failure to provide an explanation[15] for Mr. Pace's impassive demeanor allowed the state to argue that he is "a remorseless, soulless individual." T. 5604.  Hampered by their inadequate investigation, the defense team could offer no better riposte than to call Mr. Pace a "stoic, impassive young man." T. 5615. Expert testimony, however, would have told the jury that Mr. Pace's flat affect does not indicate lack of remorse, but "is characteristic of people suffering from schizophrenia." P-1 at 37; see Christenson at 226 (ineffectiveness included failure to present evidence that mental disorders caused defendant to withdraw under stress, allowing state to argue lack of remorse).

90.     It is significant that in spite of defense counsel's failures, Mr. Pace's jury sent a note to the judge asking whether they could sentence him to life without parole.

---

[15]Counsel also acted unreasonably in failing to file a motion to exclude evidence of lack of remorse during sentencing, based on his mental health deficits.

ROA 6053. This question "suggests a death sentence [] was not a foregone conclusion" despite the "undeniably horrific circumstances surrounding the deaths of [the victims]." <u>Silva</u>, 279 F.3d at 849-850. Indeed, had the jury been given an opportunity to consider Mr. Pace's mental illness, borderline retardation and brain damage, "there is a reasonable probability that at least one juror would have struck a different balance." <u>Wiggins</u>, 539 U.S. at 513; <u>Taft v. Miller</u>, 229 S.E.2d (Ga. 1976)(non-unanimous jury results in life sentence).[16]

91.    The state habeas court dismisses habeas counsel's investigation and presentation of Mr. Pace's true social and mental health history as the "formula[tion] of an alternate narrative." Order at 25. The testimony of trial counsel in this regard, which the state habeas court quotes and credits at 24-25 of its order, runs clearly contrary to <u>Wiggins</u>, <u>supra</u> . It was counsel's duty to present these facts to the jury, as this "alternate narrative" is "the kind of troubled history we have declared relevant to assessing a defendant's moral culpability." <u>Wiggins</u>, 539 U.S. at 535, see also <u>Penry v. Lynaugh</u>, 492 U.S. 303, 319 (1989). Counsel's comprehensive failures entitle Mr. Pace to relief.

**B.    Unreasonable Failure to Prepare Penalty Phase Witnesses**

---

[16]Counsel was ineffective for failing to timely file a motion to opt in to O.C.G.A. § 17-10-16, allowing the sentencing option of life without parole.   See Claim XII of Initial Amended Petition.

92.     Following emotional testimony from the family members and church acquaintances of the victims at the sentencing phase, counsel called eleven unprepared witnesses – including Mr. Pace's mother and siblings – who yielded virtually no mitigating evidence.[17] Although called ostensibly to "make the case for mercy," P-5, the witnesses instead insisted – sometimes belligerently – that Mr. Pace could not have committed the crimes for which the same jury had just convicted him and dismissed the state's physical evidence, asserting that Mr. Pace had been framed. The state pounced upon these ill-conceived statements, asking pointed questions about the DNA evidence and exposing the lack of good character evidence.  These witnesses proved so provocative that counsel devoted its closing argument to apologizing for them, begging the jury not to "hold that [testimony] against them" before essentially abandoning their supposed mitigation strategy of residual doubt by telling the jury that the witnesses believed Mr. Pace was innocent simply because they were defending family. "How many of you have ever known someone who has been convicted of a crime or someone has been accused and you say I just can't believe that because you know them? . . . They were simply expressing their sadness in the only way they knew how." T 5617-18.  This played into the prosecutor's claim that

---

[17] Witnesses included: Mr. Pace's mother; two of his mother's friends, Ida Turner and Mary Ann Booker; five of his siblings; his former girlfriend, Trena Todd; and local church leader Joe Beasley, who did not know Mr. Pace.

48

even the families of Jeffrey Dahmer or Ted Bundy family would speak well of them. T 5580.

93.     Although incredibly prejudicial to Mr. Pace, this testimony cannot have come as a surprise to the defense team, as Mr. Pace's family and friends testified precisely as expected. Prior to trial, both counsel's Nancy Mau, who would conduct the penalty phase[18], and investigator/mitigation specialist Pamela Leonard met with members of Mr. Pace's immediate family. As Ms. Leonard testified in the state habeas proceedings, the defense team "focused on the innocence case and ultimately we presented a residual doubt defense, *relying on family members to make the case for mercy*." (Emphasis added.)

94.     When Ms. Leonard interviewed Mr. Pace's siblings and family friends approximately one month before trial, however, every single family member emphasized that they would argue that Mr. Pace could not be guilty and must have been framed.[19] As Ms. Leonard describes her meeting with Mr. Mau and the family

---

[18]As discussed below, Ms. Mau's ineffective performance during the opening argument of the penalty phase led the defense team to eliminate her role in the penalty phase. See Claim III (C), *infra*.

[19]As reflected in Ms. Leonard's notes: See, e.g. 1/15/96 interview with Darrell Pace, R 3899 ("There's no way he could have done it."); 1/16/96 interview with Patty Pace Hayes, R 3827 ("Patty is adamant that Lyndon could not have committed the crimes for which he's charged . . . Patty again insisted that Lyndon was not capable of harming old people."); 1/14/96 interview with Gary Pace, Penny Pace and Gregory

members to prepare their testimony, "[i]t immediately became apparent that they had a tendency to be combative and having them testify would entail some risk." Ms. Mau noted the same concern, testifying that Mr. Pace's family "remained convinced Lyndon was innocent," which gave rise to the concern that "they would not be conciliatory before the jury." As evidently problematic as this testimony was, the defense unreasonably failed to acknowledge it. Indeed, Ms. Leonard concluded that Mr. Pace's siblings[20] were "hardworking, attractive, articulate people" who would be "very good mitigation witnesses" and "will hold steadfast to their proclamation that Lyndon is not capable of committing these murders."[21]

---

Pace, R. 3820 ("In spite of this mountain of evidence, Gary and Penny steadfastly maintained their disbelief that Lyndon committed four murders: 'Not Lyndon – he couldn't do it.'" . . . "Knowing Lyn, it's hard understanding how they accused him of these crimes." . . . "Gary is willing to testify on Lyndon's behalf and wants to think about what he wants to tell the jury about his brother. When prompted, he said that Lyndon is not capable of committing these murders." . . . "Gregory . . . unequivocally states, "Lyn is not capable of these murders.")

[20]Gregory Pace also told Ms. Leonard in his meeting with her that although he did not see much of Mr. Pace during his childhood, and although Mr. Pace could be violent within the home, Gregory did not believe him capable of the murders. He also opined that Mr. Pace was using drugs when he lived with him following his release from prison in the early 1990s.

[21]Indeed, all the evidence in the record pointed to Mr. Paces's arrests and drug use, and the defense gave no explanation for why the siblings were "hardworking, attractive, articulate people," Leonard Aff. P-5, while Mr. Pace was an illiterate drifter whose fingerprints appeared at two crimes scenes and DNA at four more.

95.    The witnesses held steadfast to those proclamations. Unfortunately, they had nothing to support their contentions that Mr. Pace was innocent and incapable of these crimes – a fact that the state readily exposed. As Ms. Leonard recalled in her affidavit, "[t]he family witnesses did not perform as we had hoped. They argued Mr. Pace could not be guilty and had in essence been framed, which allowed the State to ask pointed questions about the DNA evidence." P-5.[22] In the assessment of Ms. Mau, Mr. Pace's siblings "were defensive, and the prosecutor was able to prod them into being argumentative and unsympathetic. It was not the testimony we had hoped for." Mau. Aff. P-6.

96.    Regardless of the defense team's idle hopes[23], this testimony was the

---

[22]At trial, Gary opined that Lyndon was innocent and had been framed. He also said that Lyndon had made the choice to commit crimes in the past, and was responsible for his own actions. He was nearly as combative as Darrell Pace, whose belligerent exchange with the prosecutor prompted Mr. Mears to apologize to the jury in his closing. Darrell had spoken to the defense counsel once "a couple months before the trial. It was a very short meeting. We mostly talked about how I knew about Lyn being involved with drugs when he was young. That's mostly what I testified about at the trial too." P-25. The other siblings also expressed unsupported feelings that Mr. Pace was innocent.

[23]The misgivings expressed by some members of the defense team makes the decision to call these witnesses even more inexplicable. On the defense witness list, Ms. Leonard noted "Don't keep him up long" next to the names of Darrell, Jennifer and Gregory HT at 3807. In her trial notes on "what I've learned," Ms. Leonard acknowledged the devastating effect of this testimony. "Trust my own instincts," she wrote. "I knew Gary and Darrell were dangerous witnesses." See HT at 367.

direct result of the defense team's preparation of these witnesses – or lack thereof. If the purpose of calling these witnesses was to make the case for mercy, reasonable counsel would have instructed the witnesses simply to ask for it. Reasonable counsel, moreover, would never have called these witnesses without first preparing them to refrain from such statements.  As in Christenson, "[t]he mitigation witnesses were poorly prepared for their testimony," and "were not adequately prepared for the DA's cross-examination." Christenson, supra at 226.  They were thus "forced on cross-examination to validate the State's theme that [Petitioner] had deliberately squandered his opportunities in order to become a criminal." Id. at 228.  And as in Christenson, Mr. Pace's defense counsel "could draw no support in his closing argument from the mitigation evidence that trial counsel had presented; he admitted that the defense had no explanation for why [Petitioner] had committed the crimes or why he should be spared, other than to show his family mercy." Id.

97.    As a result of trial counsel's decision to allow the portrayal of Mr. Pace's upbringing, intelligence, and mental health as normal, the fact that his witnesses were "hardworking, attractive people" worked against him. In keeping with their ineffectiveness, his trial counsel put this argument the best: "You may look at Lyndon Pace as the burglar, the person using drugs, the person who didn't make it from among his family. He is not Gary. He is not Darryl. He is not Gregory. He is not

Patty. He is not Jennifer. They made it. Why didn't he?" T. 5618. As in Christenson, counsel did not do the work necessary to answer this question.

98.    The state habeas court erred in concluding that Ms. Mau, the member of the defense team responsible for preparing the penalty phase defense for Mr. Pace's trial, spent "an extensive amount of time researching mitigation, interviewing family members, and preparing them for their testimony." Order at 20. As Ms. Mau's own affidavit establishes, she spoke briefly with Mr. Pace's family early in the case, but could not get them to offer any insight into Mr. Pace's headaches and "disastrous" school performance, or indeed focus on any subject other than Mr. Pace's innocence. Mau Aff. P-6. See Rompilla, supra (counsel must make reasonable efforts to obtain/review evidence of aggravation even when defendant and family members suggest no mitigation is available). As discussed above, Ms. Mau's only other meetings with the witnesses were with Ms. Leonard just weeks before the trial, after the defense had resolved upon residual doubt.

99.    Mr. Pace was prejudiced by the fact that his counsel presented no mitigation evidence, but merely empty protestations of innocence. Trial counsel had witnesses available who could have given relevant mitigating testimony regarding the conditions in which Mr. Pace was raised. See Claim I A, supra. Even with their failure to investigate, counsel had mitigating mental health evidence, including

evidence of borderline intellectual functioning and organic brain damage, that could

have refuted bad character evidence. Counsel's omission of this compelling evidence

and failure to adequately prepare the witnesses left the jury with "no reasons to spare

petitioner's life." Williams, 529 U.S. at 415. Such an abject failure to prepare

penalty phase witnesses properly constitutes ineffective assistance of counsel. As the

lower court's treatment of this claim runs contrary to the precedent of the Supreme

Court of the United States, habeas relief should follow.

### C. Unreasonable Failure to Give Adequate Opening Statement at Penalty Phase

100. Ms. Mau was charged with preparing and litigating the defense's

presentation at the sentencing phase of Mr. Pace's case. Her presentation went awry

almost immediately, however, when she delivered a rambling opening statement that

drew three objections from the state and three admonitions from the court within just

three transcript pages. Her poor opening left Ms. Mau "flustered" and "unable to

continue" with her responsibilities, obliging co-counsel Michael Mears to conduct the

examination of Mr. Pace's mitigation witnesses. P-5; see also P-4. In his deposition

for the state habeas proceedings, Mr. Mears stated that Ms. Mau was "disconcerted"

by the verdict of guilty on all counts and by her role to begin the sentencing phase.

In abandoning her responsibilities and leaving the litigation of the penalty phase to

someone unprepared to conduct it, especially in conjunction with the other instances of deficient performance at the penalty phase, Ms. Mau provided ineffective assistance.

101.   The state habeas court notes that Ms. Mau "was assigned the mitigation witnesses at sentencing, although Mears eventually took over that responsibility." Order at 20.  For the reasons addressed above, that statement does not reflect the reasoning behind the change or the damage done by Ms. Mau's ineffectiveness. Moreover, the court dismissed this claim on the grounds that "the evidence of Mr. Pace's *guilt* was overwhelming" and Mr. Pace "cannot show that there was a reasonable probability that, but for trial counsel's errors, he would not have been *convicted*."  Id. at 31.  At the penalty phase, of course, the question of conviction has already been decided; thus, the proper question is whether "there is a reasonable probability that at least one juror would have struck a different balance," Wiggins, 539 U.S. at 513, and voted to spare Mr. Pace's life, but for trial counsel's errors.  This Court should review this claim and grant relief.

### D.   Unreasonable Closing Argument at Penalty Phase.

102.   When Mr. Mears gave the closing argument at the penalty phase of Mr. Pace's trial – a duty he assumed when Ms. Mau proved incapable of handling the penalty phase – Mr. Mears made no mention of the defense theme of residual doubt